## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| ) | Case No.  3:18-cv-00040-RGJ |
| In re ALMOST FAMILY, INC. ) | |
| SECURITIES LITIGATION. ) | **CONSOLIDATED AMENDED CLASS** |
| ) | **ACTION COMPLAINT FOR** |
| ) | **1. VIOLATIONS OF SECTION 14(a) OF** |
| ) | **THE SECURITIES EXCHANGE ACT** |
| ) | **OF 1934** |
| ) | **2. VIOLATIONS OF SECTION 20(a) OF** |
| ) | **THE SECURITIES EXCHANGE ACT** |
| ) | **OF 1934** |
| ) | **3. VIOLATION OF STATE LAW** |
| ) | **FIDUCIARY DUTIES** |
| ) | |
| ) | **JURY TRIAL DEMANDED** |

Lead Plaintiff Leonard Stein ("Lead Plaintiff"), by his undersigned attorneys, alleges upon

personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the

investigation of counsel, including expert affidavit attached hereto and incorporated by reference

herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Lead Plaintiff on behalf of himself and

the other public holders of the common stock of Almost Family, Inc. ("Almost Family" or the

"Company") against the Company, the members of the Company's board of directors (the "Board"

or "Individual Defendants,") and LHC Group, Inc. (as successor-in-interest) (collectively  the

"Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9,

and Regulation G, 17 C.F.R. § 244.100 in connection with the merger (the "Merger") between

Almost Family and a subsidiary of LHC Group, Inc. ("LHC").[1]

2.     On November 15, 2017, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"), pursuant to which the Company's shareholders were to receive 0.9150 shares of LHC common stock for each share of Almost Family stock they own (the "Merger Consideration"), representing an implied transaction value of approximately $2.4 billion.

3.     On February 13, 2018, Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission (the "SEC") and dissemination of the Proxy to Almost Family shareholders to solicit their votes in favor of the Merger. The Proxy set the special meeting of Almost Family shareholders to vote on the Merger for March 29, 2018.[2]

4.     Lead Plaintiff alleges that the Proxy violated Section 14(a) of the Exchange Act as follows: (i) the Proxy contained material non-GAAP projected financial measures[3] in support of the Merger Consideration without complying with Regulation G (17 C.F.R. § 244.100),[4] and (ii)

---

[1]     The Merger in issue in this Action, as described more fully below, was consummated on April 2, 2018, with Almost Family continuing as a wholly owned subsidiary of LHC.  *See* Form 8-K,  *available  at*  www.sec.gov/Archives/edgar/data/799231/000119312518105015/d522350 d8k.htm. Pursuant to the Merger Agreement (defined below) and under Delaware General Corporations Law, LHC is the successor-in-interest to Almost Family liabilities.

[2]     On December 21, 2017, LHC filed with the SEC an S-4 registration statement and joint proxy statement.  The registration statement was amended on February 5, 2018.  Almost Family filed the definitive proxy statement on February 13, 2018, that set the date for the special shareholder meeting to vote on the Merger.

[3]     *See* Affidavit of M. Travis Keath, CFA, CPA/ABV ("Keath Aff.") ¶ 9, attached hereto as Exhibit A.

[4]     Section 14(a) of the Exchange Act is violated if any person solicits any proxy ". . . . by the use of the mails or by any means or instrumentality of interstate commerce . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors . . . ." 15 U.S.C. § 78n(a).

the reliance on and utilization of material non-GAAP financial measures by the Defendants and Guggenheim Securities, LLC ("Guggenheim" or the "Financial Advisor") rendered statements in the Proxy misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9). Each of these regulatory violations constitutes a violation of Section 14(a).

5.      Regulation G: Regulation G requires that whenever a registrant publicly discloses material information in solicitation materials that includes a non-GAAP financial measure, the registrant must accompany that non-GAAP financial measure with: (i) "a presentation of the most directly comparable financial measure calculated and presented in accordance with Generally Accepted Accounting Principles" ("GAAP"); and (ii) "a reconciliation . . . which shall be quantitative for historical non-GAAP measures presented, and quantitative . . . of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP . . . ." 17 CFR 244.100(a).  Lead Plaintiff alleges that Defendants violated Regulation G when they disclosed the projected non-GAAP financial measures (1) Adjusted EBITDA less non-controlling interest ("NCI") and (2) Adjusted EBITDA less-NCI plus stock-based compensation ("SBC") and stated that the Board relied in part on these financial projections to tell shareholders the Merger Consideration was fair and to recommend that shareholders vote in favor of the Merger.

6.      Rule 14a-9(a): Rule 14a-9(a) prohibits proxy statements from: (i) containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact; and (ii) omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. 17 C.F.R. § 240.14a-9(a).

7.      When corporate actors voluntarily disclose corporate projections and valuation-related information, they must do so in a complete and accurate manner. If a corporation chooses to disclose information on a topic, the information must be truthful and complete, and the corporation cannot suppress or conceal known facts which materially qualify disclosed information.  The selective disclosure of projections and valuation information is inherently misleading because, by providing only a partial "summary" of projections or valuation analyses, shareholders are unable to properly assess the overall valuation picture of a company or transaction.

8.      The lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures renders the financial forecasts disclosed materially misleading as information critical to evaluating the transaction is intentionally withheld and shareholders are unable to reconcile the differences between the non-GAAP measures and their respective most comparable GAAP financial measures.

9.      Further, the Proxy omits material information regarding the financial analyses performed by Guggenheim in support of its fairness opinion.  Guggenheim performed *Discounted Cash Flow Analysis* ("DCF") valuations of both Almost Family and LHC to determine implied equity values for Almost Family to compare to the Merger Consideration and based this analysis on each company's respective after-tax unlevered free cash flows ("UFCF") but failed to disclose the actual projected values of UFCF or the values of the line items utilized to calculate UFCF for shareholders to determine if the equity value ranges were reasonable.  Without the actual UFCF, the Proxy contained a misleading determination of implied equity value.

10.      Breach of Fiduciary Duty: Additionally, each of the Individual Defendants violated applicable state law by directly breaching and/or aiding the other Individual Defendants' breaches

- 4 -

of their fiduciary duties of loyalty and due care which, *inter alia*, requires the Individual Defendants to act in good faith, diligence, and with candor.

11.     For these reasons, and as set forth in detail herein, Lead Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9), and against the Individual Defendants for breaches of their fiduciary duties, and seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Lead Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act. This Court also has supplemental jurisdiction over Lead Plaintiff's Delaware state law claims for breach of fiduciary duty pursuant to 28 U.S.C. §1367(a).

13.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Almost Family was headquartered in this District.

## PARTIES

15.     Lead Plaintiff was at all relevant times a holder of Almost Family common stock.

16.     Defendant Almost Family was incorporated in Delaware and prior to

consummation of the Merger, maintained its principal executive offices at 9510 Ormsby Station Road, Suite 300, Louisville, Kentucky 40223.  Prior to the consummation of the Merger, the Company's common stock traded on the NASDAQ under the ticker symbol "AFAM."

17.     Defendant LHC Group, Inc. is a Delaware corporation and was a party to the Merger Agreement.

18.     Individual Defendant William B. Yarmuth served as Chairman of the Company's Board and Chief Executive Officer since 1992, and as a director of the company since 1991.

19.     Individual Defendant Steven B. Bing  served as a director of the Company since 1992.

20.     Individual Defendant Donald G. McClinton  served as a director of the Company since 1994.

21.     Individual Defendant Tyree G. Wilburn  served as a director of the Company since 1996.

22.     Individual Defendant Jonathan D. Goldberg  served as a director of the Company since 1997.

23.     Individual Defendant W. Earl Reed, III served as a director of the Company since 2000.

24.     Individual Defendant Henry M. Altman, Jr.  served as a director of the Company since 2004.

25.     Individual Defendant Clifford S. Holtz  served as a director of the Company since 2017.

26.     The Individual Defendants referred to in paragraphs 17-24 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

27.     By reason of the above Individual Defendants' positions with the Company as directors and/or officers, said individuals were in a fiduciary relationship with Lead Plaintiff and the other public stockholders of Almost Family who were harmed by the Individual Defendants' actions described herein (the "Class").

28.     Each of the Individual Defendants was required to act in good faith in fulfilling their fiduciary duties of loyalty and due care to the Company's shareholders.  In a situation where a transaction may result in a change of corporate control, directors are required to take all reasonable steps to ensure that shareholders are able to make an informed and uncoerced choice between maintaining their current status or taking advantage of the new status being offered by the relevant proposal.

29.     As such, the Individual Defendants are obliged to honor their duty of disclosure to Almost Family's shareholders by, *inter alia*, disclosing fully and fairly all material information within their control in seeking shareholder action.  This duty ensures that shareholders have all information that will enable them to make informed, rational and intelligent decisions about whether to relinquish their shares in exchange for the consideration offered.

30.     Lead Plaintiff alleges herein that Individual Defendants, separately and together, in connection with the Merger, knowingly or recklessly violated their fiduciary duties by omitting material information within their control, which precluded Almost Family's shareholders from making an informed decision.

31.     As a result of the Individual Defendants' conduct, Lead Plaintiff and the Class were uninformed regarding the Merger and unable to exercise their fundamental right to make an informed decision regarding their future as shareholders of Almost Family.

## **CLASS ACTION ALLEGATIONS**

32.    Lead Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of Almost Family.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

33.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable.  As of the record date, February 2, 2018, there were approximately 13,991,588 shares of Almost Family common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Almost Family will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)    whether Defendants have misrepresented or omitted material information concerning the Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

iv)     whether the Individual Defendants have breached their fiduciary duties of due care, good faith, and loyalty with respect to Lead Plaintiff and the other members of the Class in connection with the conduct alleged herein;

v)      whether the process implemented and set forth by the Individual Defendants in connection with the Merger was fair to the members of the Class;

vi)     whether the Individual Defendants have breached their fiduciary duty of full and fair disclosures by failing to disclose all material facts relating to the Merger; and

vii)    whether Lead Plaintiff and other members of the Class were harmed by the Individual Defendants' conduct.

c.      Lead Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.      **Almost Family Announces the Merger**

34.     Almost Family was a provider of home health nursing, rehabilitation and personal care services, with over 340 locations in 26 states.  Almost Family and its subsidiaries operated three segments: Visiting Nurse, which provided skilled nursing and physical, occupational and speech therapy services primarily to Medicare beneficiaries; Personal Care, which provided custodial and personal care services; and the Healthcare Innovation division, which provided health and long-term care assessments and Accountable Care Organizations management services. Almost Family's services were generally covered by federal and state government programs, commercial insurance and private pay.

35.     On November 16, 2017, Almost Family and LHC issued a joint press release describing the Merger, which states in pertinent part:

> LAFAYETTE, La. and LOUISVILLE, Ky. (November 16, 2017) – LHC Group, Inc. (NASDAQ: LHCG) and Almost Family, Inc. (NASDAQ: AFAM) announced today that they have agreed to combine in an all-stock merger of equals transaction pursuant to a definitive merger agreement unanimously approved by the Boards of Directors of each company.
>
> The merger will create a nationwide provider of in-home healthcare services with a long track record of successfully partnering with hospitals and health systems led by the most experienced management team steeped in home health. The combined company will have 781 locations in 36 states with more than 31,000 employees and revenue of $1.8 billion and Adjusted EBITDA of approximately $145 million for the trailing 12-month period ended September 30, 2017.

- 10 -

[. . . .]

Under terms of the transaction, Almost Family shareholders will receive 0.9150 shares of LHC Group for each existing Almost Family share. Upon closing of the transaction, LHC Group shareholders will own 58.5% and Almost Family shareholders will own 41.5% of the combined company. The stock issuance in the merger is expected to be tax-free to shareholders of both companies. The transaction, which is expected to be completed in the first half of 2018, is subject to the receipt of regulatory approvals and other customary closing conditions as well as the approval of shareholders of both LHC Group and Almost Family.

The combined company will continue to trade on NASDAQ under the ticker symbol, "LHCG." William Yarmuth, current chairman and chief executive officer of Almost Family, will remain as a special advisor to the combined company, while Steve Guenthner, current president and principal financial officer of Almost Family, will be named chief strategy officer. Keith Myers, current chairman and chief executive officer of LHC Group, will be named chairman and chief executive officer of the combined company, while Donald Stelly will be named president and chief operating officer and Joshua Proffitt will be named chief financial officer. The Board of Directors will be comprised of ten members, six of which (including Mr. Myers and Lead Independent Director Billy Tauzin) will be current LHC Group directors and four of which will be Almost Family directors. The combined companies' Home Office will remain in Lafayette, La., and Personal Care Services, Healthcare Innovations and other support services will continue to operate out of Louisville, Ky.

. . .

William B. Yarmuth, Almost Family's chairman and CEO, added, "In my opinion, we are combining two of America's most successful home healthcare companies to create what will be the best-run, best-positioned in-home healthcare company in America.  The complementary nature of our two firms provides incredible fit, adding clinical, operational and financial strength, and depth without any meaningful conflicts or overlaps in management, geography, and service capabilities.  I believe the combined company will have the management team with the broadest and deepest experience of all the national in-home healthcare providers."

"By combining the best of both our long track records of success and patient-focused cultures, we will be able to accomplish much more together than either of us could possibly achieve alone.  I am extremely proud of the work we've done, the progress we've made, and the tremendous prospects for our future together. I look forward to working with Keith and the rest of the management team in the continued evolution of these companies."

36.     The Merger Consideration was inadequate considering the Company's financial performance and prospects for future growth prior to the Merger.  For instance, the Company had reported positive sales growth since 2013 and positive gross income growth since 2014, with double-digit gross income growth in 2016.  Moreover, the Company's EBITDA had increased by double-digits since 2014.

37.     Additionally,  during the second quarter of 2017, sales at Almost Family totaled $200.73 million. This was an increase of 28.7% from the $156.00 million in sales at the company during the second quarter of 2016. During the first two quarters of 2017, sales totaled $402.05 million, which was 29.8% higher than through the first two quarters of 2016. During the previous 16 quarters, sales at Almost Family increased compared with the same quarter in the previous year. During the year ended December of 2016, sales at Almost Family were $623.54 million. This was an increase of 17.2% versus 2015, when the company's sales were $532.21 million. This was the fifth consecutive year of sales increases at Almost Family (and since 2011, sales increased a total of 83%). Sales of Healthcare Innovations saw an increase that was more than double the company's growth rate: sales were up 654.2% in 2016, from $3.45 million to $26.03 million. Almost Family also saw significant increases in sales in Personal Care (up 26.4% to $161.37 million).

38.     The Company's sales increased faster in 2016 than  comparable companies in the industry. While Almost Family enjoyed a sales increase of 17.2%, the other companies saw smaller increases: LHC's sales were up 12.1%, Civitas Solutions Inc increased 3.0%, and Amedisys, Inc. experienced growth of 12.3%. The Company employed 15,500 employees. With sales of $623.54 million, this equated to sales of $40,228 per employee. This is a great deal lower than the three comparable companies, which had sales between $63,120 and $125,335 per employee. Note that some of the figures stated herein could be distorted based on exact classification of employees and

subcontractors.

39.     For the 52 weeks ending 11/3/2017, the stock of the Company was up 26.3% to $50.95.  .

40.     As discussed further below, the Company's shareholders could not properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Merger.   Thus, the Company's shareholders were substantially harmed as a result of being induced to vote in favor of the Merger through Defendants' preparation and dissemination of the materially false and misleading Proxy.

## II.     The Materially Incomplete and Misleading Proxy

41.     On February 13, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Merger.  The Proxy solicited the Company's shareholders to vote in favor of the Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy misrepresented and omitted material information regarding the intrinsic value of the Company that was necessary for shareholders to make an informed decision concerning whether to vote in favor of the Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Financial Projections*

42.     On page 102 of the Proxy, Defendants provided shareholders with financial projections for Net Revenue, Gross Profit, Adjusted EBITDA-NCI, Adjusted EBITDA-NCI+SBC, and Net Income in tabular format:

**Almost Family financial projections**

| (in millions of US dollars) | Fiscal Year Ending December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
| Net Revenue | $803.9 | $850.2 | $894.1 | $940.3 | $989.0 | $1,040.2 |
| Gross Profit | $385.5 | $410.8 | $430.4 | $450.9 | $472.5 | $  495.0 |
| Adjusted EBITDA-NCI | $ 65.4 | $ 87.8 | $ 94.7 | $102.2 | $109.7 | $  117.7 |
| Adjusted EBITDA-NCI+SBC | $ 68.7 | $ 90.9 | $ 97.9 | $105.5 | $113.1 | $  121.2 |
| Net Income | $ 20.7 | $ 45.1 | $ 50.2 | $ 55.1 | $ 59.6 | $   64.4 |

Proxy 102.

43.     Regarding the financial projections, the Proxy informed shareholders that "[i]n connection with the Almost Family board of directors' consideration of the proposed merger, Almost Family management prepared certain non-public unaudited prospective financial information regarding Almost Family's anticipated future performance on a stand-alone basis for fiscal years 2017 through 2022[.]"  *Id.* at 101.

44.     The Proxy also informed shareholders that the "financial projections were provided to, and reviewed and approved by, the Almost Family board of directors and provided to (i) Almost Family's financial advisor for its use and reliance in connection with its financial analyses and opinion" and were not "prepared with a view toward compliance with GAAP[.]"  *Id.*

45.     The Proxy informed shareholders that Almost Family believed that Adjusted EBITDA-NCI and  Adjusted EBITDA-NCI+SBC, "***when considered together with GAAP financial measures, provides information that is useful to investors in understanding Almost Family's operating results.***"  *Id.* at 103.

46.     Nevertheless, the Proxy also employed a common ploy in an attempt to shield the Company from liability and stated that "neither Almost Family nor LHC views the Almost Family financial projections as material because of the inherent risks and uncertainties associated with such long-term projections" on the prior page.  *Id.* at 102.  The company's gratuitous view of materiality is not controlling.

*The Materiality of Financial Projections*

47.     A company's financial projections are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the financial projections were developed "[i]n connection with the Almost Family board of directors' consideration of the proposed merger," *id.* at 101, relied on to approve the Merger Agreement and recommend the Merger to shareholders, *id.* at 73, and relied on by Guggenheim in its financial analyses supporting its fairness opinion.  *Id.* at 85.

48.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

49.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  *Id.*

50.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, ***the disclosures accompanying the projections should facilitate investor***

*understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

51.     As discussed further below, the financial projections here did not provide Almost Family's shareholders with a materially complete understanding of the assumptions and key factors utilized in their development, which shareholders would have found material since the Board's recommendation that shareholders vote in favor of the Merger was based, in part, on the Board's knowledge of the Company's future prospects.  Proxy 73-74.

**The Proxy's Misleading Disclosures Regarding the Non-GAAP Financial Projections**

52.     The Proxy informed shareholders that "*Adjusted EBITDA-NCI and Adjusted EBITDA-NCI+SBC are non-GAAP financial measures within the meaning of Regulation G* promulgated by the SEC that are used by Almost Family." *Id.* at 103.  As such, Defendants concede that they were required to either (i) provide a reconciliation of these non-GAAP financial measures to their most comparable GAAP compliant financial measure, or (2) provide an explanation as to why the non-GAAP financial measures could not be reconciled.

53.    In adopting Regulation G,[5] the SEC acknowledged that potential "misleading inferences" are exacerbated when disclosed financial information contains non-GAAP financial measures[6] and adopted Regulation G "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[7]   More specifically, the company must disclose the most directly comparable GAAP financial measure **and** a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.   17 C.F.R. § 244.100.   This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[8]

54.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[9]   Former SEC Chairwoman Mary Jo White has stated that the

---

[5]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[6]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. §244.101(a)(1).

[7]    United States Securities and Exchange Commission, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (2002), *available at* https://www.sec.gov/rules/final/33-8176.htm. ("SEC, *Final Rule*")

[8]    SEC, *Final Rule*.

[9]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times (Apr. 22, 2016), *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Almost Family included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[10]

55.    Moreover, Defendants themselves cautioned shareholders in prior quarterly earnings releases that non-GAAP financial measures "should not be considered in isolation or as a substitute for net income, operating income, cash flows from operating, investing or financing activities or any other measure calculated in accordance with generally accepted accounting principles." *See* Keath Aff. at ¶ 33 (quoting November 7, 2017 Form 8-K).

56.    Indeed, the Company has inconsistently presented non-GAAP financial measures similarly in prior SEC filings. For example, in a Form 10-K annual report, the Company reported historical **Adjusted EBITDA** and reconciled that metric to Net Income. Adjusted EBITDA is a

---

[10]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

metric different than the non-GAAP "EBITDA" metrics used to solicit shareholder votes (Adjusted EBITDA – NCI and Adjusted EBITA -NCI+SBC). [11]

| (in thousands) | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net income attributable to Almost Family, Inc. | $     20,414 | $     17,653 | $     20,009 |
| | | | |
| Add back: | | | |
|   Net income attributable to noncontrolling interests | 3,523 | 519 | -468 |
|   Interest expense, net | 7,391 | 6,285 | 2,852 |
|   Income tax (benefit) expense | -2,110 | 10,984 | 10,556 |
|   Franchise taxes | 954 | 625 | 609 |
|   Depreciation and amortization | 5,438 | 3,909 | 3,927 |
|   Stock-based compensation | 2,950 | 2,735 | 2,121 |
|   Deal, transition and other costs | 29,405 | 11,842 | 4,139 |
| Adjusted EBITDA | $     67,965 | $     54,552 | $     43,745 |

57.    This inconsistent treatment by Defendants of these material financial measures renders the non-GAAP measure in the Proxy misleading.

58.    This cautionary language about the misleading nature of non-GAAP financial measures is also echoed in treatises regarding valuation and financial analyses.  *See* Keath Aff. ¶ 37 (citing to The Valuation Handbook's discussion of non-GAAP financial measures). Additionally, legal commentators have also acknowledged that "in recent years, the use of non-GAAP financial measures has become more widespread, and the magnitude of the differences between non-GAAP and GAAP . . . measures has grown[,]" and that "[t]he SEC continues to emphasize the need for caution with regard to the use of non-GAAP measures[.]"  Keath Aff. ¶ 38.

59.    In fact, several of today's most prolific business leaders, including Warren Buffett and Jamie Dimon, all agree that a "common accounting standard is critical for corporate

---

[11]    10-K Annual Report at 61, filed with the SEC on February 27, 2018, *available at* www.sec.gov/Archives/edgar/data/799231/000155837018001156/afam-20171229x10k.htm.

transparency" and have resolved to never use non-GAAP measurements "in such a way as to obscure GAAP-reported results . . . ."[12]

60.     As such, Defendants were required to provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures or provide information regarding why one of the narrow exemptions to Regulation G applied in order to bring the Proxy into compliance with Regulation G.

61.     Defendants' attempts to avail themselves of the so-called "unreasonable efforts" exemption from Regulation G directly contradicted other statements in the Proxy, rendering the Proxy materially false and/or misleading.

62.     The Proxy informed shareholders that:

> Non-GAAP financial measures used by Almost Family may not be comparable to similarly titled financial measures used by LHC or other companies. ***Almost Family does not provide a reconciliation of the forward-looking non-GAAP financial measures of Adjusted EBITDA-NCI and Adjusted EBITDA-NCI+SBC to the comparable GAAP financial measures because it is unable to reasonably predict certain items contained in the GAAP measures***, including non-recurring and infrequent items that are not indicative of Almost Family's ongoing operations. These items are uncertain, depend on various factors and could have a material impact on Almost Family's GAAP results for the applicable period.

Proxy 103 (emphasis added).

63.     The Proxy further provided the following definitions for the very same financial measures referenced above:

> Adjusted EBITDA-NCI is defined as an amount equal to ***GAAP net income*** attributable to Almost Family for such period excluding: (i) interest income, (ii) interest expense, (iii) provision for taxes on income, (iv) depreciation and amortization expenses and (v) non-cash expenses and non-recurring expenses identified by Almost Family's management.   Adjusted EBITDA-NCI+SBC is

---

[12]     Commonsense Corporate Governance Principles, *available at* https://corpgov.law.harvard .edu/wp-content/uploads/2016/07/Fact-Sheet-for-Commonsense-Corporate-Governance-Principles.pdf;          https://lawprofessors.typepad.com/business_law/2016/07/is-good-corporate-governance-just-a-matter-of-common-sense.html.

defined as an amount equal to **GAAP net income** attributable to Almost Family for such period excluding: (i) interest income, (ii) interest expense, (iii) provision for taxes on income, (iv) depreciation and amortization expenses, (v) non-cash expenses and non-recurring expenses identified by Almost Family's management and (vi) stock-based compensation expense.

*Id.* at 102-03 (emphasis added).

64.     First and foremost, the GAAP financial measure that the Defendants disclosed they were "unable to reasonably predict" was in fact disclosed in the very same table that discloses the non-GAAP figures.  *See* ¶ 41; Proxy 102, 103.

65.     Second, the Company's purported inability to reconcile the non-GAAP figures is misleading at best and false at worst considering, per the Company's own definitions, in order to calculate either of the non-GAAP figures, one is required to start with their most comparable GAAP figure, **GAAP net income.**  *See supra* ¶ 42.

66.     As such, not only was the Proxy materially deficient for failing to comply with Regulation G, but Defendants' half-hearted attempt to avoid disclosing a reconciliation of the non-GAAP figures referenced above renders the Proxy materially misleading and/or false.

***The Incomplete and Misleading Financial Projections Rendered the Summary of Guggenheim's Financial Analyses Materially Misleading.***

67.     Compounding on the materially misleading nature of the non-GAAP financial projections discussed above is the fact that these same projections were purportedly relied upon by the Company's financial advisor, Guggenheim, in connection with its valuation analyses and respective fairness opinion.  Proxy 86.

68.     Both academics and practitioners acknowledge that the discounted cash flow analysis "is the very core of modern corporate finance."  Keath Aff. ¶ 14.  Because of its "fundamental importance in the determination of corporate value, it follows that the propriety of the financial projections used to create the DCF analysis in the fairness presentation prepared by

[Guggenheim] (which was relied upon by the Company's Board in making its recommendation to shareholders) is commensurately important." Keath Aff. ¶ 15.

69.     Defendants acknowledged the importance of understanding Guggenheim's fairness opinion and the financial analyses conducted in support thereof. Proxy 88.  Moreover, Defendants warned shareholders that "the summary data and tables could create a misleading or incomplete view of Guggenheim['s] [] financial analyses." *Id.*  Nevertheless, the Proxy failed to adequately disclose material information regarding the Company's valuation and the work of Guggenheim. Keath Aff. ¶¶ 12-29.

70.     For the reasons discussed below, the lack of opacity concerning the Company's internal projections rendered the summary of Guggenheim's valuation analyses materially incomplete and misleading.

71.     With respect to Guggenheim's use of Adjusted EBITDA-NCI+SBC in certain of its financial analyses, it appears that the Company and Guggenheim used different versions of the non-GAAP financial metric.

72.     As mentioned above, the Company defined the metric as "***GAAP net income*** attributable to Almost Family for such period excluding: (i) interest income, (ii) interest expense, (iii) provision for taxes on income, (iv) depreciation and amortization expenses, (v) non-cash expenses and non-recurring expenses identified by Almost Family's management and (vi) stock-based compensation expense." Proxy 103 (emphasis added).

73.     The Proxy also disclosed that Guggenheim defined the metric as "***operating earnings*** (after add-back of stock-based compensation) before interest, taxes, depreciation and amortization, less non-controlling interest expenses excluding certain non-cash expenses and non-recurring expenses." *Id.* at 89 (emphasis added).

74.     Although on first glance there is an appearance that they are one and the same, *GAAP Net Income* and *Operating Earnings* are not synonymous.  More specifically, Operating Earnings is synonymous with earnings before interest and taxes ("EBIT"), yet another non-GAAP financial measure that was not disclosed.

75.     Because the Defendants chose not to disclose the various line items used in these calculations, shareholders were misled as it is unclear whether Guggenheim was comparing apples to apples or apples to oranges in its respective analyses.

76.     With respect to Guggenheim's *Discounted Cash Flow Analysis* for both Almost Family and LHC, the Proxy stated that Guggenheim based its discounted cash flow analysis on each company's respective "after-tax unlevered free cash flows" as contemplated in the "five-year financial projections for Almost Family as provided by Almost Family's senior management" and the "five-year financial projections for LHC as provided by LHC's senior management (and approved for use by Almost Family's senior management)."  Proxy 91, 93.

77.     The Proxy further disclosed that Guggenheim utilized Almost Family's unlevered free cash flows in conducting its DCF analysis, Proxy 91, and that Guggenheim defined UFCF as "after-tax unlevered operating cash flow minus CapEx and changes in working capital."  *Id.* at 89.

78.     Despite disclosing that the UFCF projections were utilized by Guggenheim based upon financial projections provided by each Company's management, the Proxy failed to disclose the actual projected values of UFCF or the values of the line items utilized to calculate UFCF.

79.     Without this information, Almost Family's shareholders were unable "to assess the merit of Guggenheim's analysis and therefore [determine] the weight (if any) to place on Guggenheim's conclusions."  Keath Aff. ¶ 15.

80.     As such, the absence of this information renders Guggenheim's discounted cash flow analyses incomplete and misleading.

81.     The definition of projected after-tax UFCF is, in and of itself, and separate and apart from the mandates of Regulation G, materially false and/or misleading in violation of SEC Rule 14a-9 (17 C.F.R. 240.14a-9).   Because neither the method nor the line items used to calculate projected after-tax UFCF were disclosed, shareholders were unable to discern the veracity of Guggenheim's illustrative discounted cash flow analyses.

82.     Without further information, shareholders were unable to compare Guggenheim's calculations with the Company's financial projections.   Thus, the Company's shareholders were materially misled regarding the value of the Company.   *See* Keath Aff. ¶ 11 ("I consider it axiomatic that shareholders should be informed about the merits (or lack thereof) with respect to any transaction for which their approval is sought.").

83.     These key inputs were material to Almost Family shareholders, and their omission rendered the summary of Guggenheim's discounted cash flow analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices, "each of which can significantly affect the final valuation."   Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).   Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.*   As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.   This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions . . . .

*Id.* at 1577-78.

84.    Compounding on the misleading nature of the disclosures surrounding unlevered free cash flow, there was a heightened need for further information here because Guggenheim "used a non-standard definition of unlevered free cash flow[.]"  Keath Aff. ¶ 22.  Moreover, "[i]t is not readily apparent that the respective definitions of unlevered free cash flow used by the financial advisors [were] mathematically equivalent to one another[.]" Keath Aff.  ¶ 25.

85.    Clearly, shareholders would have found this information material since the Board's unanimous recommendation that shareholders vote in favor the Merger was based, in part, on the following:

- its knowledge of Almost Family's business, operations, financial condition, earnings and prospects, as well as its assessment of LHC's business, operations, financial condition, earnings and prospects, taking into account the results of Almost Family's due diligence review of LHC;

*********

- the opinion, dated November 15, 2017, of Guggenheim Securities to Almost Family's board of directors as to the fairness, from a financial point of view and as of the date of the opinion, of the exchange ratio to the stockholders of Almost Family (excluding LHC Group and its affiliates), which opinion was based on and subject to the matters considered, the procedures followed, the assumptions made and various limitations of and qualifications to the review undertaken as more fully described under the section entitled "— Opinion of Almost Family's Financial Advisor" below;

Proxy 73-74.

86.    As a result of the omission of the Company's and LHC's projected UFCF, Almost Family's shareholders were precluded from "independently assess[ing] both the Company's value and LHC's value using the single-most meaningful valuation method – DCF analysis[.]"  Keath Aff. ¶ 26.  "[T]his omission alone constituted a material shortcoming in the total mix of information available to Almost Family's shareholders."  *Id.* at ¶ 26.

87.     In sum, the Proxy independently violated both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information rendered certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravened the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Merger from Almost Family shareholders.

88.     Moreover, the Individual Defendants breached their fiduciary duties to Almost Family's shareholders by failing to disclose the aforementioned material information in their possession both fully and fairly to allow shareholders to freely choose between voting in favor of or against the Merger.

89.     As a result, Lead Plaintiff and the other members of the Class were not able to make a fully-informed decision regarding whether to vote in favor of the Merger and were thus harmed as a direct and proximate result of the aforementioned facts.

## ADDITIONAL ALLEGATIONS

90.     The Proxy solicited shareholder votes in favor of the Merger with LHC and disclosed that the Almost Family board of directors recommended the Merger based on the Company's projected GAAP and non-GAAP financial measures and contained the summary of a fairness opinion delivered by Guggenheim, in its role as the Company's financial advisor, to the Almost Family Board in support of the Merger.

91.     Guggenheim's fairness opinion addressed the exchange ratio of 0.9150 shares of LHC common stock to be paid for each share of Almost Family common stock (the "Merger Consideration") and concluded that the Merger Consideration was fair from a financial point of

view. Guggenheim's fairness opinion was delivered to the Company's Board of Directors on November 15, 2017.

92.     The Almost Family board of directors also recommended the Merger based on its independent review of the Company's projected financial measures. Proxy 73, 101.

93.     The question of the fair value of Almost Family's common stock was central to the decision facing the Company's shareholders. As detailed herein, the disclosures ("Pre-Merger Disclosures") set forth in the Proxy suffered from a number of material omissions regarding the following important topics:

> a.  The Proxy withheld from shareholders the unlevered free cash flows of both Almost Family and LHC (*see* Keath Aff. ¶¶ 12-29); and
>
> b.  The Proxy failed to provide the information necessary to reconcile Almost Family's non-GAAP financial metrics (such as unlevered free cash flows and EBITDA) to the GAAP-based financial metrics underlying the financial projections relied upon by the Company's financial advisor (*see id.* at ¶¶ 30-40).

94.     It was unnecessary and inappropriate to withhold from Almost Family's shareholders readily available information that would have afforded a far clearer indication with respect to the Company's value, and these omissions constitute a material shortcoming in the disclosures made to Almost Family's shareholders because this omitted information, as described above, was material information.

95.     It is axiomatic that shareholders should be informed about the merits (or lack thereof) with respect to any transaction for which their approval is sought. Indeed, Defendants themselves have acknowledged as much in the Proxy by admonishing shareholders to reach a full understanding of the financial analyses underlying Guggenheim's Fairness Opinion.

> In order to understand fully understand [Guggenheim's financial analyses summarized in the Proxy], the summary data and tables must be read together with the full text of the summary.

Proxy 88.

96.     The Proxy further acknowledged the potential of the information pertaining to Guggenheim's analysis to be misleading if all analyses and factors were not considered:

> If read alone, the summary data and tables could create a misleading or incomplete view of Guggenheim Securities' financial analyses.

*Id.* at 88.

97.     The Pre-Merger Disclosures failed to provide adequate information to investors – particularly with respect to (i) unlevered free cash flows of Almost Family and LHC, and (ii) the important information necessary to reconcile projected non-GAAP financial measures to their most directly comparable GAAP-based counterparts.

98.     The DCF analysis has primacy among corporate valuation techniques. This particular analysis, in fact, forms the basis for all other valuation techniques and is the very core of modern corporate finance. Both academicians and practitioners alike acknowledge this principle.[13][14][15]

---

[13]     "Discounted cash flow (DCF) forms the core of finance . . . . Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance."

"Developing an Automated Discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[14]     "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation. This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[15]     "In finance theory, present value models [also referred to as discounted cash flow models]

99.     Because DCF analyses are of such fundamental importance in the determination of corporate value, it follows that the propriety of the financial projections used to create the DCF analysis in the fairness presentation prepared by Almost Family's financial advisor (which was relied upon by the Company's Board in making its recommendation to shareholders) is commensurately important. This information would have enabled Almost Family's shareholders to independently prepare DCF analyses, as well as to assess the merit of Guggenheim's analysis, and therefore the weight (if any) to place on Guggenheim's conclusions.

100.    The unique vantage point from which it is able to ascertain the future outlook for the operations of the business makes management's assessment of the Company's future operating and financial performance all but irreplaceable in most instances. For this reason, thorough disclosure with respect to the projected cash flows required to prepare a DCF analysis (including the manner in which such cash flows were calculated) is a staple in the vast majority of proxy statements filed by publicly traded companies being acquired in corporate mergers

101.    Defendants themselves explicitly acknowledged the importance of future free cash flows to the Merger, indicating that "the increased financial strength, low leverage and strong free cash flows of the combined company will better position it to accelerate LHC's strategic initiatives[.]" Proxy 70.

102.    In contrast to normal practice, however, the Pre-Merger Disclosures inappropriately excluded the unlevered free cash flows of both Almost Family and LHC used in Guggenheim's *Discounted Cash Flow Analysis*.[16] Instead, the projections in the Pre-Merger

---

are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014. 22.

[16]     *Id.* at 91, 93.

Disclosures included only revenue, gross profit, net income and two measures of EBITDA for the two cases.[17][18]

103.    Although the importance of omitting Almost Family's cash flows was perhaps self-evident, the omission of LHC's cash flows was equally problematic in this instance because all of the Merger Consideration paid to the Company's shareholders consisted of LHC common stock. Accordingly, it was important for Almost Family's shareholders to be made aware of the pertinent information necessary to determine the worth of LHC.

104.    Generally speaking, if an acquirer's stock is deemed by the target's shareholders to be overvalued, such acquirer's stock will tend to be perceived, cet. par., as less favorable than would otherwise be the case (and vice-versa). As such, it was as important for Almost Family's shareholders to examine and understand the value of the consideration they stood to *receive* (i.e., LHC common stock) as the value of what they were being asked to *sell* (i.e., their shares of the Company).

105.    For its own DCF analyses of Almost Family and LHC, Guggenheim utilized management-prepared financial projections that it "was advised by Almost Family's senior management and LHC's senior management . . . that [the management-prepared] financial projections . . . utilized in its analyses had been reasonably prepared on bases reflecting the best then-currently available estimates and judgments of Almost Family's senior management and LHC's senior management [respectively] as to the expected future performance of Almost Family and LHC, [respectively.]" Proxy 87.  Guggenheim, with the understanding that such information

---

[17]    "EBITDA" is a commonly used acronym for "earnings before interest, taxes, depreciation, and amortization."

[18]    One of the measures of EBITDA deducted non-controlling interest expense, while the other deducted non-controlling interest expense and added back stock-based compensation expense.

had been reviewed by the Company's Board of Directors and approved for use in its fairness opinion, based its DCF analysis of Almost Family on the five-year financial projections provided by the Company's senior management,[19] and its DCF analysis of LHC on the five-year financial projections provided by LHC's senior management (and approved for use by Almost Family's senior management).[20]

106.    The need for clarity regarding how projected unlevered free cash flow figures were calculated was heightened in this instance due to the fact that Guggenheim, the Company's financial advisor, used a non-standard definition of unlevered free cash flow:

> Unlevered free cash flow: means the relevant company's after-tax unlevered operating cash flow minus CapEx and changes in working capital.[21]

107.    To make matters worse, the definition of "after-tax unlevered operating cash flow" was not provided in the Proxy, rendering the definition of unlevered free cash flow more opaque still.  To the extent that "operating cash flow" was intended to be used synonymously with "cash flow from operations" as that term had historically been used in the Company's GAAP-based statements of cash flow (note that it is not clear whether this was Defendant's intention), cash flow from operations (i) already reflects an after-tax figure, and (ii) already reflects changes in the Company's working capital.  Although unlikely, this raises the possibility that taxes and/or the working capital adjustments were double-counted.

108.    LHC's financial advisor, Jefferies LLC ("Jefferies"), on the other hand, used a more conventional definition:

---

[19]      *See id.* at 87, 91.

[20]      *Id.* at 93.

[21]      *Id.* at 89.

> Unlevered free cash flow was calculated by using tax effecting (sic) [each of LHC's and Almost Family's] forecasted EBIT figure at [the] applicable tax rate, adding back depreciation and amortization and stock based compensation expense, deducting capital expenditures and changes in net working capital, in the case of each of the foregoing, as included in [the financial projections of LHC and Almost Family, respectively].[22]

109.    It is not readily apparent that the respective definitions of unlevered free cash flow used by the financial advisors are mathematically equivalent to one another, which leaves the possibility that different figures were used by each. If this is true, shareholders should have been apprised of that fact and given the opportunity for a closer examination in order to determine whether one calculation was more suitable than the other for the purpose of valuing Almost Family and LHC. Even if this is not true and the same figures were used by both financial advisors, shareholders should not be left to wonder. Consequently, adequate disclosure regarding unlevered free cash flows was necessary in this instance not only to facilitate shareholders' ability to independently perform DCF analyses but also to establish the propriety (or lack thereof) of the unlevered free cash flow figures used by Guggenheim for Almost Family and LHC.

110.    Because it precluded Almost Family's shareholders from being able to independently assess both the Company's value and LHC's value using the single-most meaningful valuation method - DCF analysis - the projected unlevered free cash flows were of such singular importance that this omission alone constituted a material shortcoming in the total mix of information available to Almost Family's shareholders.

111.    Whether individually or in combination, none of the accounting measures presented for Almost Family and LHC in the financial projections included in the Pre-Merger Disclosures (revenue, gross profit, net income, and EBITDA adjusted for non-controlling interests and/or

---

[22]    *Id.* at 82.

- 32 -

stock-based compensation) was a substitute for unlevered free cash flow when preparing a DCF

analysis. Because EBITDA in particular is sometimes misunderstood to be equivalent to cash flow,

it is important to emphasize that the two are not the same and must not be treated as if they were.

Shannon Pratt, a longtime valuation practitioner and author, points out "this error is not a minor

matter."[23]

112.   While EBITDA is widely used by financial analysts and can be useful in the

appropriate context, the valuation community recognizes that the metric has its shortcomings and

limitations and should not be overemphasized when other important financial information is

available. According to The Valuation Handbook:

> EBITDA can be a useful measure to assess a company's performance, [but] has a number
> of shortcomings that should not be ignored when using it, including, but not limited to,
> the following:
> - EBITDA represents debt-free firms, which is not the case for most companies . . . .
> - EBITDA also ignores tax payments, which profitable firms cannot, or cannot always,
>   avoid . . . .
> - It does not take into account firms with different capital investments and the
>   depreciation that comes with them . . . .
> - EBITDA does not exclude all noncash items such as the allowance for bad debts and
>   inventory write-downs as well as the impact of investments in working capital . . . .[24]

113.   The wider investment community has likewise learned to use caution when

considering EBITDA. While acknowledging its merits when used appropriately, Moody's

Investors Service has long warned against overreliance on EBITDA. In a 23-page *Special

Comment* dated June 2000, Moody's indicated:

> We find the ten critical failings of using EBITDA to be the following:
>    1.   EBITDA ignores changes in working capital and overstates cash flow in

---

[23]   "Occasionally, we find an analyst treating earnings before interest, taxes, depreciation,
and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter . . . ."
Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." *Cost of Capital*. 16.

[24]   Thomas, Rawley and Benton A. Gup, The Valuation Handbook; John Wily & Sons, Inc.
Hoboken, NJ. pp. 529-30.

periods of working capital growth

2. EBITDA can be a misleading measure of liquidity

3. EBITDA does not consider the amount of required reinvestment – especially for companies with short lived assets

4. EBITDA says nothing about the quality of earnings

5. EBITDA is an inadequate standalone measure for comparing acquisition multiples

6. EBITDA ignores distinctions in the quality of cash flow resulting from differing accounting policies – NOT all revenues are cash

7. EBITDA is not a common denominator for cross- border accounting conventions

8. EBITDA offers limited protection when used in indenture covenants

9. EBITDA can drift from the realm of reality

10. EBITDA is not well suited for the analysis of many industries because it ignores their unique attributes[25]

114.    Elsewhere in the same *Special Comment*, Moody's noted that knowledge of the limitations of EBITDA was commonplace, indicating that "[b]y all appearances, most corporate managers are aware of the limitations of EBITDA. In varying language, many financial statements contain warnings regarding the use of EBITDA."[26]

115.    Already on record regarding the issue, Moody's again urged caution in 2014, when it explained that "calculating EBITDA can be open to interpretation," that "EBITDA may be calculated aggressively to portray a more favorable credit profile," and that "issuers can have a tendency to more aggressively calculate EBITDA to improve their credit metrics and facilitate market access." Perhaps most pointedly, one of the concluding remarks of the 2014 Special Comment was that "EBITDA cannot be taken at face value and generally should be evaluated alongside other liquidity and cash metrics."[27]

---

[25]    Moody's Investors Service, *Special Comment* entitled *Putting EBITDA In Perspective: Ten Critical Failings of EBITDA as the Principal Determinant of Cash Flow*; June 2000, p. 1.

[26]    *Id.* at 3.

[27]    Moody's Investors Service, *Special Comment* entitled *EBITDA: Used and Abused*; November 20, 2014, pp. 1, 5, and 8.

116.     The importance of reconciling between non-GAAP and GAAP financial measures is (and has long been) widely acknowledged. The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information. Regulation G states that when a publicly-traded company, such as Almost Family, discloses material information that includes non-GAAP financial measures, the company also must include the most directly comparable GAAP financial measure, as well as a reconciliation of the two. 17 C.F.R. § 244.100(a). Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.[28]

117.     Regulation G applies in the context of a merger transaction such as the one at issue in this case.

118.     Defendants themselves emphasized in Almost Family's quarterly earnings releases the importance of distinguishing between non-GAAP and GAAP financial metrics, alerting shareholders to the fact that the latter

> . . . should not be considered in isolation or as a substitute for net income, operating income, cash flows from operating, investing or financing activities, or any other measure calculated in accordance with generally accepted accounting principles.[29]

119.     Even in the Proxy itself, Defendants warned shareholders that "[n]on-GAAP financial measures used by Almost Family may not be comparable to similarly titled financial measures used by LHC or other companies."  Proxy 103.

---

[28]     White, *supra* n.10.

[29]     *See* quarterly earnings release dated November 7, 2017 (filed on Almost Family's Form 8-K dated November 9, 2017).

120.     Despite these cautionary messages, Defendants inexplicably withheld from shareholders the financial figures necessary to reconcile the differences between non-GAAP and GAAP projected financial metrics in their consideration of the value of the Company, the value of LHC, and the merits and risks facing them with respect to the Merger.

121.     The failure to disclose these financial figures is particularly problematic because Defendants appear to have calculated these figures. The Proxy disclosed the projected GAAP metric of Net Income and the two non-GAAP EBITDA measures. To do this, presumably, Defendants created the information necessary to reconcile the non-GAAP measure with their GAAP equivalent but chose not to disclose the reconciliation.  *Id.* at 102.

122.     The shortcomings of the non-GAAP metrics referred to in the Company's earnings releases and SEC filings were consistent with cautionary language appearing in guidance published for valuation and financial analysis. According to The Valuation Handbook:

> Many have objected to the use of . . . so-called non-GAAP measures. The [SEC] and the International Organization of Securities Commissions ("IOSCO") are among them. At the end of the previous century and the start of this century, the SEC debated the subject in many comment letters that were sent to companies using such measures. In May 2002, the IOSCO also cautioned issuers, investors and other users of financial information to use care when presenting and interpreting non-GAAP measures.[30]

123.     According to a March 2017 article on legal news service Law360, "based on recent and continuing indications by the Division of Corporation Finance, the Division of Enforcement, and Acting Chairman Michael Piwowar," the SEC is expected to continue its scrutiny of non-GAAP disclosure:

> Non-GAAP measurements serve a valid purpose, which is to improve and supplement a company's financial disclosures and provide additional comparability between periods and among firms. However, because non-GAAP disclosures are by definition unshackled from the prescriptions of GAAP, they are susceptible to potential manipulation and vulnerable to claims that they were used to mislead

---

[30]     The Valuation Handbook 531.

investors. Issuers should remain vigilant in ensuring that they are releasing only comparable and useful non-GAAP measures, or they risk adding their name to a growing list of enforcement actions brought by the SEC.[31]

124.     A Law360 article indicated that "in recent years, the use of non-GAAP financial measures has become more widespread, and the magnitude of the differences between non-GAAP and GAAP. . . measures has grown."[32] The article went on to say that "[t]he SEC continues to emphasize the need for caution with regard to the use of non-GAAP measures," and to cite sources indicating that 2015 non-GAAP earnings per share ("EPS") of companies in the Dow Jones Industrial Average were approximately 31% higher than EPS reported based on GAAP,[33] and that earnings for S&P 500 firms grew nearly 14% from 2012 to 2015 based on non-GAAP measures, but were essentially unchanged based on GAAP.[34]

125.     Recent growth in the appearance of non-GAAP metrics in proxy statements has been significant. According to accounting research firm Audit Analytics, "more and more proxy statements include non-GAAP language. In 2009, fewer than 20% of proxies had such language; but by 2016, nearly 60% did."[35]

126.     Investing is always a forward-looking endeavor, and a direct examination of the benefits anticipated from a given investment provides insight that is unavailable in any other way – even from analyses as important as those based on the market approach (which entails

---

[32]     Harwood, Elaine, Frank Mascari and Laura Simmons: *Renewed SEC Focus On Non-GAAP Measures: 1 Year Later*, May 16, 2017; Law360.com.

[33]     John Butters, "Did DJIA Companies Report Higher Non-GAAP EPS in FY 2015?" FactSet, March 11, 2016, https://insight.factset.com/2016/03/earningsinsight_03.11.16.

[34]     Michael Rapoport and Dave Michaels, "SEC Tightens Crackdown on 'Adjusted' Accounting Measures," Wall Street Journal, May 18, 2016, https://www.wsj.com/articles/sec-tightens-crackdown- on-adjusted-accounting-measures-1463608923.

[35]     http://www.auditanalytics.com/blog/use-of-non-gaap-in-proxy-statements/.

comparison to comparable public companies and precedent merger transactions). It therefore stands to reason that a reconciliation of non-GAAP to GAAP *projected* financial metrics is of at least comparable – if not greater – importance than the same information provided on an *historical* basis.

127.    This is perhaps especially true in the instance of Almost Family, because the fairness opinion which formed part of the basis for the Board's recommendation to shareholders did not refer to any GAAP financial measures. The only financial measures underlying Guggenheim's valuation analysis were non-GAAP measures:

      a.  *Discounted Cash Flow Analysis*:[36] Unlevered free cash flow

      b.  *Selected Publicly Traded Companies Analysis*:[37]

          i)  Adj. EBITDA – NCI[38] + SBC[39]

          ii) Adj. EPS[40]

      c.  *Selected Precedent M&A Transactions Analysis*:[41] *Adj*. EBITDA – NCI + SBC

128.    Although the Company's Board of Directors made its recommendation to shareholders to vote in favor of the Merger, the final decision rested with the shareholders themselves. Unfortunately, the Pre-Merger Disclosures suffered from material omissions with

---

[36]    Proxy at 91.

[37]    *Id.* at 92.

[38]    "NCI" stands for "non-controlling interests."

[39]    "SBC" stands for "stock-based compensation."

[40]    *Id.* at 81. Adj. EPS: means the relevant company's earnings per share, adjusted for amortization of intangible assets and deferred financing fees. The Pre-Merger Disclosures excluded both amortization of intangible assets and deferred financing fees.

[41]    *Id.* at 97.

respect to the information necessary to enable Almost Family's shareholders to reach adequately informed conclusions regarding whether to follow the Board's recommendation or to decline the offer and vote against the Merger

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

129.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

130.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

131.    As set forth above, the Proxy omitted information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violated Section 14(a).  SEC Regulation G among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

132.    The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violated Regulation G and constituted a violation of Section 14(a).

133.    Lead Plaintiff and the Class were injured as a direct and proximate result of the aforementioned facts.  As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that stockholders approve of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (i.e. the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger), in an amount to be determined at trial, and are entitled to such equitable relief as the Court deems appropriate, including recissory damages.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

134.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

135.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in any proxy statement that contains "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a-9.

136.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

137.    Defendants issued the Proxy with the intention of soliciting shareholder support for

the Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company and LHC.

138.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

139.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

140.    The Individual Defendants knew or were negligent in not knowing that the material information identified above had been omitted from the Proxy, rendering the sections of the Proxy identified above materially incomplete, misleading, and false.

141.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved

in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

142.    Almost Family is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

143.    The misrepresentations and omissions in the Proxy were material to Lead Plaintiff and the Class, who were deprived of their right to cast an informed vote as a result of the materially incomplete, misleading, and false information found in the Proxy.

144.    Lead Plaintiff and the Class were injured as a direct and proximate result of the aforementioned facts.  As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that stockholders approve of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (i.e. the difference between the value they received as a result of the Merger and the true value of their shares prior to the Merger) in an amount to be determined at trial, and are entitled to such equitable relief as the Court deems appropriate, including recissory damages.  By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act

## COUNT III

**(Against the Individual Defendants for Violations**
**of Section 20(a) of the Exchange Act)**

145.    Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

146.    The Individual Defendants acted as controlling persons of Almost Family within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Almost Family, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements

contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were materially incomplete and misleading.

147.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

148.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  They were thus directly involved in preparing the Proxy.

149.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

150.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

151.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), Regulation G, and

Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

152.    Lead Plaintiff and the Class were injured as a direct and proximate result of the aforementioned facts.

## COUNT IV

### On Behalf of Lead Plaintiff and the Class for Breach of Fiduciary Duties
### (Against the Individual Defendants)

153.    Lead Plaintiff repeats and realleges each and every allegation set forth herein.

154.    The Individual Defendants have violated their fiduciary duties owed to the public shareholders of Almost Family and have acted to put their personal interests ahead of the interests of Almost Family shareholders or acquiesced in those actions by fellow defendants.  These Individual Defendants have failed to take adequate measures to ensure that the interests of Almost Family's shareholders were properly protected.

155.    The Individual Defendants, individually and acting as a part of a common plan, unfairly deprived Lead Plaintiff and other members of the Class of their fundamental right to make an informed decision.

156.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have breached their duties of loyalty, good faith, and care by not fully disclosing to Lead Plaintiff and the Class all material information necessary to make an informed decision regarding the Merger.

157.    As a result of the actions of Defendants, Lead Plaintiff and the Class have been harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Lead Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Declaring that the Proxy distributed by defendants to shareholders was materially incomplete, false and misleading, in violation of Regulation G, Rule 14a-9, and Section 14(a) of the Exchange Act;

C.      Directing Defendants to account to Lead Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Lead Plaintiff and the members of the Class compensatory and/or rescissory damages against Defendants; directing Defendants to account to Lead Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

E.      Awarding Lead Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other expenses; and

F.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury on all issues so triable.

Dated:  February 1, 2019

Respectfully submitted,

**BURKE NEAL PLLC**

*/s/ Jamie K. Neal*
Jamie K. Neal
Kevin C. Burke
2220 Dundee Road, Suite C

Louisville, KY 40205
Tel.: (502) 709-9975
Email: jamie@burkeneal.com
Email: kevin@burkeneal.com

*Counsel for Lead Plaintiff*
*Leonard Stein and Liaison*
*Counsel for the Class*

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr. (admitted *pro hac vice* in *Leonard Stein v. Almost Family, Inc.*, No. 3:18-cv-129-TBR)
Nadeem Faruqi
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: jwilson@faruqilaw.com
Email: nfaruqi@faruqilaw.com

*Counsel for Lead Plaintiff*
*Leonard Stein and Lead*
*Counsel for the Class*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Leonard Stein ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Almost Family, Inc. ("Almost Family") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Almost Family securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 21st day of January 2018.

_____
Leonard Stein

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 06/28/16 | 200 |
| | | |
| | | |
| | | |